**MAYER BROWN LLP**
EVAN M. TAGER (*pro hac vice* application pending)
*etager@mayerbrown.com*
ARCHIS A. PARASHARAMI (SBN 321661)
*aparasharami@mayerbrown.com*
KEVIN S. RANLETT (*pro hac vice* application pending)
*kranlett@mayerbrown.com*
1999 K Street N.W.
Washington, D.C. 20006
Telephone: (202) 263-3000
Facsimile:  (202) 263-3300

*Attorneys for Defendants AT&T Inc., AT&T Services, Inc.*
*and AT&T Mobility LLC*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KATHERINE SCOTT, CAROLYN JEWEL, and GEORGE PONTIS, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>AT&T INC.; AT&T SERVICES, INC.; AT&T MOBILITY, LLC; TECHNOCOM CORP.; and ZUMIGO, INC.,<br><br>Defendants. | Case No. 19-cv-4063-JD<br><br>**NOTICE OF MOTION AND MOTION OF DEFENDANTS AT&T INC., AT&T SERVICES, INC., AND AT&T MOBILITY, LLC TO COMPEL ARBITRATION AND STAY PROCEEDINGS**<br><br>Date:          December 19, 2019<br>Time:          10:00 AM<br>Location:     Ctrm. 11 (San Francisco)<br>Judge:        Hon. James Donato |

# TABLE OF CONTENTS

**Page(s)**

NOTICE OF MOTION AND MOTION ...................................................................................... 1

MEMORANDUM OF POINTS AND AUTHORITIES .............................................................. 2

BACKGROUND ........................................................................................................................ 3

I.      PLAINTIFFS EACH AGREED TO ARBITRATE DISPUTES WITH AT&T .............. 3

II.     AT&T'S ARBITRATION PROVISION PROVIDES CONSUMERS WITH FAIR PROCEDURES FOR THE RESOLUTION OF INDIVIDUAL DISPUTES ........ 6

III.    PLAINTIFFS SUE AT&T DESPITE THEIR AGREEMENT TO ARBITRATE ........... 7

ARGUMENT .............................................................................................................................. 8

I.      THE FAA REQUIRES THAT PLAINTIFFS' AGREEMENTS TO ARBITRATE DISPUTES ON AN INDIVIDUAL BASIS BE ENFORCED .......................................... 8

II.     PLAINTIFFS CANNOT INVOKE CALIFORNIA'S MCGILL RULE TO EVADE ARBITRATION BECAUSE THE RELIEF THEY SEEK IS, AT BOTTOM, A PRIVATE INJUNCTION—NOT A PUBLIC ONE................................... 9

III.    If MCGILL APPLIES, THE COURT SHOULD RESERVE JUDGMENT ON AT&T'S MOTION PENDING FURTHER APPELLATE REVIEW OF THE NINTH CIRCUIT'S Decisions In BLAIR AND MCARDLE ........................................ 11

CONCLUSION.......................................................................................................................... 15

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

### <u>Cases</u>

4

5
*Alascom, Inc. v. ITT N. Elec. Co.*,
727 F.2d 1419 (9th Cir. 1984) ...............................................................13, 14

6
*Allied-Bruce Terminix Cos. v. Dobson*,
513 U.S. 265 (1995)........................................................................................8

7

8
*AT&T Mobility LLC v. Concepcion*,
563 U.S. 333 (2011)...............................................................................2, 8, 14

9

10
*Bell-Sparrow v. SFG\*Proschoicebeauty*,
2019 WL 1201835 (N.D. Cal. Mar. 14, 2019).......................................3, 9, 10, 11

11
*Blair v. Rent-A-Ctr., Inc.*,
928 F.3d 819 (9th Cir. 2019) ........................................................ *passim*

12

13
*Cherny v. AT&T, Inc.*,
2010 WL 2572929 (C.D. Cal. Feb. 8, 2010)................................................15

14

15
*Croucier v. Credit One Bank, N.A.*,
2018 WL 2836889 (S.D. Cal. June 11, 2018).....................................................3, 9

16
*DIRECTV, Inc. v. Imburgia*,
136 S. Ct. 463 (2015)....................................................................................14

17

18
*Epic Sys. Corp. v. Lewis*,
138 S. Ct. 1612 (2018).........................................................................2, 13, 14

19

20
*Ernst & Young LLP v. Morris*,
834 F.3d 975 (9th Cir. 2016) .......................................................................13

21
*Johnson v. JP Morgan Chase Bank, N.A.*,
2018 WL 4726042 (C.D. Cal. Sept. 18, 2018) ..........................................3, 10, 11

22

23
*Kilgore v. KeyBank Nat'l Ass'n*,
718 F.3d 1052 (9th Cir. 2013) (*en banc*) ...................................................9

24

25
*Kim v. CashCall, Inc.*,
2017 WL 8186683 (C.D. Cal. June 8, 2017) ...............................................13

26
*Kindred Nursing Ctrs. L.P. v. Clark*,
137 S. Ct. 1421 (2017)................................................................................2, 14

27

28

*Lamps Plus, Inc. v. Varela*,
   139 S. Ct. 1407 (2019) .................................................................8, 14

*Landis v. N. Am. Co.*,
   299 U.S. 248 (1936) ..........................................................................12

*Leyva v. Certified Grocers of Cal., Ltd.*,
   593 F.2d 857 (9th Cir. 1979) .............................................................12

*Lockyer v. Mirant Corp.*,
   398 F.3d 1098 (9th Cir. 2005) ...........................................................12

*McArdle v. AT&T Mobility LLC*,
   772 F. App'x 575 (9th Cir. June 28, 2019) ................................. *passim*

*McElrath v. Uber Techs., Inc.*,
   2017 WL 1175591 (N.D. Cal. Mar. 30, 2017) ..................................13

*McGill v. Citibank, N.A.*,
   393 P.3d 85 (Cal. 2017) ............................................................ *passim*

*McGovern v. U.S. Bank N.A.*,
   362 F. Supp. 3d 850 (S.D. Cal. 2019) .................................................3

*Milkowski v. Thane Int'l. Inc.*,
   2008 WL 11342962 (C.D. Cal. July 21, 2008) .................................12

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*,
   460 U.S. 1 (1983) ...............................................................................8

*Nationstar Mortg., LLC v. RAM LLC*,
   2017 WL 1752933 (D. Nev. May 4, 2017) ...............................12, 15

*Provo v. Rady Children's Hosp.-San Diego*,
   2015 WL 6144029 (S.D. Cal. July 29, 2015) ...................................15

*Rappley v. Portfolio Recovery Assocs., LLC*,
   2017 WL 3835259 (C.D. Cal. Aug. 24, 2017)...............................3, 9

*Roman v. Northrop Grumman Corp.*,
   2016 WL 10987312 (C.D. Cal. Dec. 14, 2016) ................................13

*Sponheim v. Citibank, N.A.*,
   2019 WL 2498938 (C.D. Cal. June 10, 2019) ........................3, 10, 11

*Tillage v. Comcast Corp.*,
   772 F. App'x 569 (9th Cir. 2019) ............................................. *passim*

-iii-

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*United States v. Clayton*,
    108 F.3d 1114 (9th Cir. 1997) ...................................................................8

*Wright v. Sirius XM Radio Inc.*,
    2017 WL 4676580 (C.D. Cal. June 1, 2017) ....................................3, 10

**<u>Statutes & Rules</u>**

Communications Act, 47 U.S.C. § 201 *et seq.* .......................................................7

Federal Arbitration Act, 9 U.S.C. § 1 *et seq.* ................................................ *passim*

Consumer Legal Remedies Act, Cal. Civ. Code 1750....................................7

Unfair Competition Law, Cal. Bus. & Prof. Code § 17200............................7

Fed. R. Civ. P. 11(b) .......................................................................................6

Sup. Ct. R. 10.................................................................................................14

Fed. R. App. P. 35(b)(1)(B) ...........................................................................15

AT&T'S MOTION TO COMPEL ARBITRATION AND STAY PROCEEDINGS;
CASE NO. 19-cv-4063-JD

1

**NOTICE OF MOTION AND MOTION**

2      PLEASE TAKE NOTICE that, on December 19, 2019, at 10:00 a.m., or as soon thereafter

3 as counsel may be heard, before the Honorable James Donato, in Courtroom 11 of the United

4 States District Court for the Northern District of California, located at 450 Golden Gate Avenue,

5 San Francisco, California 94102, Defendants AT&T Services, Inc., AT&T Mobility LLC, and

6 AT&T Inc. (collectively, "AT&T") shall and hereby do move the Court for an order compelling

7 plaintiffs Katherine Scott, Carolyn Jewel, and George Pontis to arbitrate their claims in accordance

8 with their arbitration agreements.

9      This motion is authorized by the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1–16, and

10 supported by the accompanying Memorandum of Points and Authorities, the declarations of Paula

11 Berg, Kevin Kelly, Kevin Ranlett, and Lara Schnieber, and such other written and oral argument

12 as may be presented to the Court.

13

**STATEMENT OF ISSUE PRESENTED**

14      Whether the FAA requires enforcement of Plaintiffs' agreements to arbitrate their  disputes

15 with AT&T on an individual basis.

16

17

18

19

20

21

22

23

24

25

26

27

28

1

1

2

**MEMORANDUM OF POINTS AND AUTHORITIES**

**INTRODUCTION**

3

4

5

6

Plaintiffs Katherine Scott, Carolyn Jewel, and George Pontis have filed their claims in the wrong forum.  Each time they entered into a new Wireless Customer Agreement with AT&T, they not only agreed to AT&T's Privacy Policy but also agreed to resolve their disputes with AT&T—including the claims asserted in this action—in arbitration on an individual basis.[1]

7

8

9

10

11

12

13

14

15

16

The FAA requires enforcement of those agreements, notwithstanding any contrary state law.  The U.S. Supreme Court has reiterated that the FAA preempts state-law rules that declare an arbitration agreement "unenforceable *just because it requires bilateral arbitration*."  *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1623 (2018) (italics in original).  As the Court has explained, a rule that "attack[s] (only) the individualized nature of the arbitration proceedings * * * seeks to interfere with one of arbitration's fundamental attributes" and thus cannot be squared with the FAA.  *Id.* at 1622; *see also*, *e.g.*, *Kindred Nursing Ctrs. L.P. v. Clark*, 137 S. Ct. 1421, 1426 (2017).  Indeed, the Supreme Court's seminal decision on this point involved an AT&T arbitration provision that is materially identical to the one to which Plaintiffs here agreed.  *See AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 352 (2011).

17

18

19

20

21

22

23

Recently, the California Supreme Court attempted an end-run around *Concepcion*'s holding that states may not condition the enforcement of arbitration provisions on the availability of class-wide procedures.  In *McGill v. Citibank, N.A.*, 393 P.3d 85 (Cal. 2017), the California Supreme Court held that arbitration agreements that prevent consumers from asserting certain consumer-protection claims for injunctive relief on behalf of the general public are invalid under California law.  AT&T anticipates that Plaintiffs here will invoke the *McGill* rule to try to evade enforcement of their arbitration agreements.

24

25

26

Any reliance on *McGill* must fail, however, because the injunctive relief Plaintiffs seek is directed at a subgroup of AT&T customers, not the general public as a whole.  Under such

27

28

---

[1]   AT&T Inc. joins this motion to compel arbitration only in the event that the Court denies its motion to dismiss for lack of personal jurisdiction, which is being filed contemporaneously with this motion.  AT&T Inc. does not waive its right to object to the Court's jurisdiction.

2

circumstances, the *McGill* rule does not apply as a matter of state law.  Indeed, numerous district courts in this Circuit have held *McGill* inapplicable when—as here—plaintiffs seek what amounts to private injunctive relief on behalf of a class, rather than an injunction benefiting the public in general.  *See, e.g.*, *Sponheim v. Citibank, N.A.*, 2019 WL 2498938, at *4–6 (C.D. Cal. June 10, 2019); *Bell-Sparrow v. SFG*Proschoicebeauty*, 2019 WL 1201835, at *5 n.9 (N.D. Cal. Mar. 14, 2019); *McGovern v. U.S. Bank N.A.*, 362 F. Supp. 3d 850, 857-58 (S.D. Cal. 2019); *Johnson v. JP Morgan Chase Bank, N.A.*, 2018 WL 4726042, at *6–8 (C.D. Cal. Sept. 18, 2018); *Croucier v. Credit One Bank, N.A.*, 2018 WL 2836889, at *4 (S.D. Cal. June 11, 2018); *Rappley v. Portfolio Recovery Assocs., LLC*, 2017 WL 3835259, at *5–6 (C.D. Cal. Aug. 24, 2017); *Wright v. Sirius XM Radio Inc.*, 2017 WL 4676580, at *9–10 (C.D. Cal. June 1, 2017).

Moreover, even if *McGill* were applicable here, the FAA would preempt it.  We acknowledge that a panel of the Ninth Circuit recently held that the FAA does *not* preempt the *McGill* rule.  *Blair v. Rent-A-Ctr., Inc.*, 928 F.3d 819, 830–31 (9th Cir. 2019).  In a concurrently filed opinion, the same panel applied *McGill* in refusing to enforce AT&T's arbitration agreement—the same arbitration agreement involved in *Concepcion*.  *McArdle v. AT&T Mobility LLC*, 772 F. App'x 575, 575 (9th Cir. June 28, 2019).  AT&T submits that those panel decisions contravene Supreme Court precedent.  *En banc* review is being sought in *McArdle* (as well as in a companion case involving Comcast).  Pet. for Rehearing, ECF No. 55, *McArdle v. AT&T Mobility LLC*, No. 17-17246 (9th Cir. Aug. 9, 2019); Pet. for Rehearing, ECF No. 56, *Tillage v. Comcast Corp.*, No. 18-15288 (9th Cir. Aug. 9, 2019).  If the Court concludes that Plaintiffs in fact are seeking public injunctive relief as defined in *McGill*, it should stay any decision on this motion to compel arbitration pending resolution of *en banc* and, if necessary, Supreme Court proceedings in *McArdle* and *Tillage*.

## **BACKGROUND**

## I.    **PLAINTIFFS EACH AGREED TO ARBITRATE DISPUTES WITH AT&T.**

Each Plaintiff entered into multiple wireless service contracts containing arbitration provisions at AT&T retail stores.

---

3

1   For example, on February 4, 2009, Scott purchased a new line of service and entered into

2   a wireless service contract at an AT&T retail store.  Decl. of Paula Berg ¶¶ 7–9, Exs. 1–3.  During

3   that transaction, Scott would have been presented with a printed copy of AT&T's Terms of Service

4   then in effect and a Customer Service Summary describing her rate plan and notifying her that she

5   was accepting AT&T's "arbitration clause."  *Id.* ¶ 9, Ex. 3; Decl. of Lara Schnieber ¶ 3.  Scott also

6   was presented with an electronic signature-capture device asking her to click to "Accept" the

7   contract terms.  *Id.* ¶¶ 3–4.  After pressing the "Accept" button on the device, Scott signed under

8   the following acknowledgment: "I have read, understood and agree to be bound by the agreement

9   for wireless service on the above number.  The agreement I am signing includes the Customer

10  Service Summary, Terms of Service, Rate Plan and feature brochures for the services described in

11  the Customer Service Summary all of which I acknowledge were presented to me prior to my

12  signing below."  Schnieber Decl. ¶ 4; *see also* Berg Decl. Ex. 2 (record of Scott's signature).

13  On September 20, 2013, Scott again agreed to AT&T's contract terms when she purchased

14  a new phone at an AT&T retail store and activated it for use on AT&T's network.  Berg Decl.

15  ¶¶ 14–16.  During this transaction, Scott followed a materially identical process, except that the

16  signature-capture device displayed the entire Wireless Customer Agreement.  Schnieber Decl. ¶ 6,

17  Ex. 1.  Scott had the option to scroll through that Agreement or to press the "Print" button to obtain

18  a hard copy; she then pressed "Accept" and signed her name below the following attestation: "I

19  have reviewed and agree to the rates, terms, and conditions for the wireless products and services

20  described in the Wireless Customer Agreement (including limitation of liability and arbitration

21  provisions) and the Customer Service Summary, both of which were made available to me prior

22  to my signing."  *Id.* ¶¶ 6, 7; *see also* Berg Decl. Ex. 7 (record of Scott's signature).[2]

23  ─────────────────────

24  [2]   Scott also agreed to AT&T's arbitration clause in connection with a telephone order for a
     wireless phone that she purchased for use on another line of service on February 17, 2009.  Berg

25  Decl. ¶¶ 10–11.  For this transaction, Scott received a Customer Service Summary via email and
     a physical copy of AT&T's terms of service with her new phone.  *Id.* ¶ 10.  She was then required

26  to accept AT&T's terms of service via AT&T's interactive voice response ("IVR") system before
     she could use her new phone on AT&T's network.  *Id.* ¶ 11.  The IVR system requires the

27  subscriber to answer a series of questions to confirm his or her identity and then to press a button

28  on the telephone keypad to indicate agreement to AT&T's terms of service.  *Id.* ¶¶ 11–13.

4

1    The other two Plaintiffs—Pontis and Jewel—also accepted AT&T's contract terms during

2    in-store transactions following this same process.  For example, Pontis entered into contracts at

3    AT&T stores on December 5, 2009 and September 13, 2015.  Berg Decl. ¶¶ 20–22.  And Jewel

4    did so on July 17 and 22, 2008, May 10, 2014, February 8, 2017, and March 4 and 7, 2017.  *Id.* ¶¶

5    24–37.  In each transaction, Pontis and Jewel received Customer Service Summaries, pressed

6    "Accept," and then signed their names under attestations that they accepted AT&T's contract

7    terms.  Schnieber Decl. ¶¶ 3–7; *see also* Berg Decl. Exs. 13–18, 20–21, 23–24, 26–27, 29–30, 32–

8    33, 35–36, 38–39 (records of Pontis's and Jewel's signatures and their Customer Service

9    Summaries).[3]

10    Each AT&T contract that Scott, Jewel, and Pontis accepted begins by highlighting AT&T's

11    arbitration provision, stating (in the first or second paragraph) that "**[t]his Agreement requires**

12    **the use of arbitration**" (or "**arbitration on an individual basis**") to "**resolve disputes**."  Decl.

13    of Kevin Kelly Ex. 1 at 1 & Ex. 2 at 1 (emphasis in original) (capitalization in original omitted);

14    *see also id.* Exs. 3–7 (preambles).  The Agreements also all provide that "AT&T and you agree to

15    arbitrate **all disputes and claims** between us" and that "[t]his agreement to arbitrate is intended to

16    be broadly interpreted."  *E.g.*, *id.*, Ex. 4–7 § 2.2(1) (emphasis in original); *see also id.* Ex. 1 at 14,

17    Ex. 2 at 14, Ex. 3 at 15.  The Agreements further provide that the arbitrator may award "injunctive

18    relief only in favor of the individual party seeking relief and only to the extent necessary to provide

19    relief warranted by that party's individual claim."  *E.g.*, *id.* Ex. 1 at 17, Ex. 2 at 18, Ex. 3 at 18,

20    Exs. 4–7 § 2.2(6).  And the Agreements specify that claims will be brought in the claimant's

21    "individual capacity," with the arbitrator lacking power to "preside over any form of a

22    representative or class proceeding."  *Id.*

23

24

25

26    [3]    For the transactions before May 2, 2010, Pontis and Jewel would have received the contract
terms in physical Terms of Service booklets, as Scott did for her February 2009 purchase.

27    Schnieber Decl. ¶ 3.  For the later transactions, Pontis and Jewel were presented with the full
Wireless Customer Agreement on a signature-capture device or iPad and had the option to press

28    "Print" to obtain a printed copy.  *Id.* ¶¶ 5–7.

5

## II.   AT&T'S ARBITRATION PROVISION PROVIDES CONSUMERS WITH FAIR PROCEDURES FOR THE RESOLUTION OF INDIVIDUAL DISPUTES.

AT&T's arbitration provision includes several features that ensure that customers have a simple and efficient means of resolving any disputes that may arise:

- **Cost-free arbitration:**  For claims up to $75,000, "AT&T will pay all [American Arbitration Association ("AAA")] filing, administration, and arbitrator fees" unless the arbitrator determines the customer's claim "is frivolous or brought for an improper purpose (as measured by the standards set forth in Federal Rule of Civil Procedure 11(b))."[4]

- **$10,000 minimum award:**  If the arbitrator issues an award in favor of a customer that is greater than "AT&T's last written settlement offer made before an arbitrator was selected," then AT&T will pay the customer $10,000 rather than any smaller arbitral award.[5]

- **Double attorneys' fees:**  If the arbitrator awards the customer more than "AT&T's last written settlement offer made before an arbitrator was selected," then "AT&T will * * * pay [the customer's] attorney, if any, twice the amount of attorneys' fees, and reimburse any expenses (including expert witness fees and costs), that [the] attorney reasonably accrues for investigating, preparing, and pursuing [the] claim in arbitration."[6]

- **Small claims court option:**  Either party may bring a claim in small claims court as an alternative to arbitration.

- **Flexible consumer procedures:**  Arbitration will be conducted under the AAA's Consumer Arbitration Rules, which the AAA designed with consumers in mind.[7]

---

[4]    The arbitration provision that Jewel accepted in her 2008 transactions requires AT&T to pay all AAA fees, regardless of the size of the claim.  Kelly Decl. Ex. 1 at 15.

[5]    The arbitration provision that Jewel accepted in her 2008 transactions has a smaller premium for customers who recover more than AT&T's settlement offer: the "the greater of (a) $5,000 or (b) the maximum claim that may be brought in small claims court in the county of [the customer's] billing address."  Kelly Decl. Ex. 1 at 16.

[6]    The provision for double attorneys' fees "supplements any right to attorneys' fees and expenses [the customer] may have under applicable law."  *E.g.*, Kelly Decl. Ex. 4 § 2.2(5).  Thus, even if an arbitrator were to award a customer less than the company's last settlement offer, the customer would be entitled to an attorneys' fees award to the same extent as if his or her individual claim had been brought in court.

[7]    The arbitration provision references the AAA's Commercial Arbitration Rules and Supplementary Procedures for Consumer-Related Disputes.  *E.g.*, Kelly Decl. Ex. 4 § 2.2(3).  But in September 2014, the AAA replaced those rules for administering consumer disputes with its new Consumer Arbitration Rules.  Decl. of Kevin Ranlett Ex. 1, at 1.  The AAA applies the

6

- **Choice of in-person, telephonic, or no hearing:** For claims of $10,000 or less, the customer has the exclusive right to choose whether the arbitrator will conduct an in-person hearing, a telephonic hearing, or a "desk" arbitration in which "the arbitration will be conducted solely on the basis of documents submitted to the arbitrator."

- **Conveniently located hearing:** Arbitration will take place "in the county (or parish) of [the customer's] billing address."

- **AT&T disclaims right to seek attorneys' fees:** "Although under some laws AT&T may have a right to an award of attorneys' fees and expenses if it prevails in an arbitration, AT&T agrees that it will not seek such an award."

- **No confidentiality requirement:** Either party may publicly disclose the arbitration and its result.

- **Full individual remedies available:** The arbitrator can award any form of relief on an individualized basis (including statutory and punitive damages, attorneys' fees, and injunctions that would affect the claimant alone) that a court could award.

- **Right to a written decision:** "Regardless of the manner in which the arbitration is conducted, the arbitrator shall issue a reasoned written decision sufficient to explain the essential findings and conclusions on which the award is based."

*E.g.*, Kelly Decl. Ex. 4 §§ 2.2(3)–(6).

## III.   PLAINTIFFS SUE AT&T DESPITE THEIR AGREEMENT TO ARBITRATE.

Despite having agreed to arbitration, on July 16, 2019, Plaintiffs filed this putative class action against AT&T.  *See* Dkt. No. 1.  In their complaint, Plaintiffs allege that AT&T improperly allowed third parties to access real-time location data generated in the course of providing wireless telecommunications services to subscribers.  *Id.* ¶¶ 1–9.  Plaintiffs assert statutory claims for alleged violations of the federal Communications Act, 47 U.S.C. § 201 *et seq.*, California's Unfair Competition Law ("UCL") (Cal. Bus. & Prof. Code § 17200), and California's Consumer Legal Remedies Act ("CLRA") (Cal. Civ. Code 1750)—as well as common-law claims for intrusion upon seclusion and negligence, and a privacy claim under the California Constitution.  Dkt. No. 1, at ¶¶ 280–342.  As relief, Plaintiffs seek monetary damages, interest, and attorneys' fees and costs, as well as an injunction seeking "a mandatory cessation of AT&T's practices and proper

---

Consumer Arbitration Rules "whenever" an agreement has "provided for arbitration by the American Arbitration Association ('AAA'), and" the agreement has "specifie[d] that the Supplementary Procedures for Consumer-Related Disputes shall apply."  *Id.* Ex. 1, at 9.

7

safeguarding of current and historical location data." *Id.* ¶¶ 299, 343.

## ARGUMENT

### I.   THE FAA REQUIRES THAT PLAINTIFFS' AGREEMENTS TO ARBITRATE DISPUTES ON AN INDIVIDUAL BASIS BE ENFORCED.

Under the FAA, arbitration agreements are "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. "The overarching purpose of the FAA * * * is to ensure the enforcement of arbitration agreements according to their terms so as to facilitate streamlined proceedings." *Concepcion*, 563 U.S. at 344. And this "liberal federal policy favoring arbitration agreements" applies "notwithstanding any state substantive or procedural policies to the contrary." *Id.* at 346 (quotation marks omitted).

The FAA applies to any "written" agreement to arbitrate that appears in "a contract evidencing a transaction involving commerce." 9 U.S.C. § 2. Here, both criteria are met: (i) Plaintiffs' arbitration agreements are in writing (Kelly Decl., Exs. 1–7); and (ii) contracts for wireless service involve commerce because "[t]elephones are instrumentalities of interstate commerce." *United States v. Clayton*, 108 F.3d 1114, 1117 (9th Cir. 1997); *see also Allied-Bruce Terminix Cos. v. Dobson*, 513 U.S. 265, 277 (1995) (FAA "signals an intent to exercise Congress' commerce power to the full.").

Moreover, Plaintiffs' claims fall within the all-encompassing scope of their arbitration agreements, which require each of them "to arbitrate **all disputes and claims** between [them and AT&T]." *E.g.*, Kelly Decl., Ex. 4 § 2.2(1). And even if there were some ambiguity in this broad language, the FAA "establishes that, as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration[.]" *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25 (1983); *see also Lamps Plus, Inc. v. Varela*, 139 S. Ct. 1407, 1418–19 (2019) ("[T]he FAA provides the default rule for resolving certain ambiguities in arbitration agreements.").

Thus, absent any "grounds as exist at law or in equity for the revocation of *any* contract," the FAA mandates that Plaintiffs' arbitration agreements be "enforce[d]" (9 U.S.C. § 2) and this action "stay[ed] * * * until such arbitration has been had in accordance with the terms of the

8

1  agreement[.]" (*id.* § 3).

2  **II.  PLAINTIFFS CANNOT INVOKE CALIFORNIA'S *MCGILL* RULE TO EVADE
3      ARBITRATION BECAUSE THE RELIEF THEY SEEK IS, AT BOTTOM, A
        *PRIVATE* INJUNCTION—NOT A *PUBLIC* ONE.**

4          Here, there are no "grounds" that "exist in law or equity for the revocation of any contract"

5  that would invalidate Plaintiffs' arbitration agreements.  In their complaint, Plaintiffs tack onto

6  their UCL and CLRA claims a request for what they say is "public injunctive relief" (Dkt. No. 1

7  ¶¶ 299, 342, 343(C)), thus signaling an intent to invoke California's *McGill* rule.  In *McGill*, the

8  California Supreme Court held that a contractual waiver of a consumer's ability to seek an

9  injunction under the UCL and CLRA on behalf of the "general public" violates California public

10  policy.  393 P.3d at 94.  Critically, though, *McGill* applies only to requests for truly *public*

11  injunctive relief—and not to requests for *private* injunctions artfully styled as requests for "public"

12  injunctive relief.  *McGill* is therefore inapplicable here, because Plaintiffs' requested injunction is,

13  at bottom, a "private" injunction that would benefit only themselves and a similarly situated subset

14  of California AT&T wireless subscribers.  *See* Dkt. No. 1 ¶ 276.

15          In order to constitute a "public injunction" under *McGill*, the relief sought must "'by and

16  large benefit the public'" in general.  *Croucier*, 2018 WL 2836889, at *4 (quoting *Kilgore v.

17  KeyBank Nat'l Ass'n*, 718 F.3d 1052, 1060 (9th Cir. 2013) (*en banc*)).  Public injunctions typically

18  seek to "benefit 'the public directly by the elimination of deceptive practices,' but do not otherwise

19  benefit the plaintiff[.]"  *Blair*, 928 F.3d at 824 (quoting *McGill*, 393 P.3d at 90).  "Private"

20  injunctions, in contrast, "ha[ve] the primary purpose or effect of redressing or preventing injury to

21  an individual plaintiff—*or to a group of individuals similarly situated to the plaintiff*."  *McGill*,

22  393 P.3d at 90 (emphasis added); *accord Bell-Sparrow*, 2019 WL 1201835, at *5 n.9 (quoting

23  *McGill*).

24          Since *McGill* was decided, courts have routinely compelled arbitration of purportedly

25  "public injunction" claims that, in reality, seek a "private" injunction.  *See, e.g.*, *Croucier*, 2018

26  WL 2836889, at *4–5 (request to enjoin debt-collection practices constitutes a "private" rather

27  than "public" injunction, because class members rather than the general public would be the

28

beneficiaries); *Rappley*, 2017 WL 3835259, at \*5–6 (a "closer inspection" of plaintiff's claims "reveals that the relief she seeks is intended to redress and prevent further injury" to putative class members and therefore "does not constitute public injunctive relief").

In particular, courts have characterized as "private" those injunctions that seek principally to benefit a defendant's customers rather than the public at large. *E.g.*, *Wright*, 2017 WL 4676580, at \*9–10 (requested injunction was necessarily "private" in nature, because it would "solely benefit" those who had purchased lifetime subscriptions from the defendant); *Bell-Sparrow*, 2019 WL 1201835, at \*5 n.9 (holding that *McGill* was not triggered by request for injunction against an allegedly unlawful fee the defendant charged customers).

In *Sponheim*, for example, the court compelled individual arbitration of claims challenging Citibank's foreign-transaction fee practices, despite the plaintiff's invocation of the *McGill* rule. 2019 WL 2498938, at \*5.  The court held that the injunction sought was fundamentally "private" in nature because the "primary aim" of the plaintiff's suit was to "gain[] compensation for injury for himself and others similarly situated" (there, all "California plaintiffs that have held Citibank checking accounts within the applicable statute of limitations").  *Id.* at \*5.  The court noted that the plaintiff's claims "ar[ose] out of the contractual rights and obligations between Citibank and its customers, not deceptive advertising or marketing to the general public as in *McGill*."  *Id.*

Similarly, in *Johnson* the court held that *McGill* did not bar individual arbitration of claims brought on behalf of five putative classes of Chase Bank customers seeking to enjoin the company from charging particular customer fees despite the plaintiffs' characterization of that relief as a "public" injunction.  2018 WL 4726042, at \*7.  The court held that, irrespective of how the claims were pleaded, "the relief Plaintiffs seek does not constitute public injunctive relief"; rather, "a closer inspection reveals that the relief sought is actually intended to redress and prevent further injury to a [defined] group of plaintiffs \* \* \* who have already incurred the allegedly unlawful fees"—not "the general public."  *Id.*

Plaintiffs' UCL and CLRA claims here are materially indistinguishable from those that courts have found to be fundamentally "private" in nature.  Even a cursory inspection of Plaintiffs'

1    allegations confirms that the "primary aim" of this suit is compensation for Plaintiffs and similarly

2    situated AT&T customers.  Plaintiffs' requested "public" injunctions specifically seek to "restore

3    *to the parties* in interest money or property taken as a result of AT&T's [allegedly] unfair

4    competition" and to enjoin AT&T from continuing its allegedly unlawful data sharing practices.

5    Dkt. No. 1 ¶ 299 (UCL claim); *id.* ¶ 342 (CLRA claim) (emphasis added).  That relief does not

6    benefit the public at large.  Rather, the principal (if not sole) beneficiaries of that injunction would

7    be Plaintiffs and the putative class of AT&T customers they seek to represent—namely, California

8    "AT&T wireless subscribers * * * whose carrier-level location data" was allegedly "used or

9    accessed * * * without proper authorization." *Id.* ¶ 276.

10       Plaintiffs cannot avoid that result by claiming to be seeking to enjoin AT&T's allegedly

11   unlawful customer data-sharing practices "in order to protect the public." *Id.* ¶¶ 299, 342.  Courts

12   have rejected comparable attempts to convert a private injunction into a public one by re-styling it

13   as one directed against further "wrongdoing."   As Judge Gonzalez Rogers put it, "[m]erely

14   requesting relief which would generally enjoin a defendant from wrongdoing does not elevate

15   requests for injunctive relief to requests for *public* injunctive relief." *Bell-Sparrow*, 2019 WL

16   1201835, at *5 n.9; *see also Johnson*, 2018 WL 4726042, at *6 (same); *Sponheim*, 2019 WL

17   2498938, at *4 ("Merely declaring that a claim seeks a public injunction * * * is not sufficient to

18   bring that claim within the bounds of the rule set forth in *McGill*." (quotation marks omitted)).

19   Thus, Plaintiffs' bare reference to protecting the public "does not elevate" their request for

20   manifestly *private* injunctive relief into a public injunction. *Johnson*, 2018 WL 4726042, at *6;

21   *accord Bell-Sparrow*, 2019 WL 1201835, at *5 n.9.  Plaintiffs do not, for example, seek to change

22   AT&T's marketing to the public at large. *See, e.g.*, *Sponheim*, 2019 WL 2498938, at *5

23   (distinguishing between injunctions addressing allegedly unlawful "marketing" directed at the

24   public and injunctions aimed at business practices directed only at a defendant's customers).

25       In short, *McGill* does not apply because Plaintiffs are not seeking public injunctive relief.

26

27

28

### III.   IF *MCGILL* APPLIES, THE COURT SHOULD RESERVE JUDGMENT ON AT&T'S MOTION PENDING FURTHER APPELLATE REVIEW OF THE NINTH CIRCUIT'S DECISIONS IN *BLAIR* AND *MCARDLE*.

Even if Scott, Jewel, and Pontis were seeking public injunctive relief that would trigger California's *McGill* rule, their arbitration agreements still would be enforceable because *McGill* is preempted by the FAA.  To be sure, a Ninth Circuit panel recently held that the FAA does not preempt *McGill*. *Blair*, 928 F.3d at 830–31; *McArdle*, 772 F. App'x at 575; *Tillage v. Comcast Corp.*, 772 F. App'x 569, 569 (9th Cir. 2019).  But petitions for rehearing *en banc* have been filed in *McArdle* and *Tillage*, and AT&T therefore respectfully requests that if the Court concludes that *McGill* is applicable here, the Court stay any ruling on this motion until the completion of *en banc* and/or Supreme Court review in those cases.[8]

This Court has broad discretion to stay its ruling "pending resolution of independent proceedings which bear upon the case" if the Court "find[s] it is efficient for its own docket and the fairest course for the parties to enter a stay of an action before it." *Leyva v. Certified Grocers of Cal., Ltd.*, 593 F.2d 857, 863 (9th Cir. 1979).  The power to issue such a stay derives from the Court's "inherent" authority to "control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants," *Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936), and requires consideration of the "competing interests which will be affected"—including the relative "hardship or inequity" that may result from granting the stay, or from requiring these proceedings to go forward, and whether the stay could "simplify[] * * * issues, proof, and questions of law." *Lockyer v. Mirant Corp.*, 398 F.3d 1098, 1110 (9th Cir. 2005).

Most importantly, a stay pending *en banc* and/or Supreme Court review in *McArdle* and *Tillage* carries the potential to greatly "simplify[]" these proceedings.  Courts have routinely granted stays when further appellate proceedings could result in conservation of party and judicial resources by streamlining or obviating the need for further proceedings. *See*, *e.g.*, *Nationstar Mortg., LLC v. RAM LLC*, 2017 WL 1752933, at *1–2 (D. Nev. May 4, 2017) (granting a stay "[t]o save the parties from the need to invest resources preparing for trial or additional

---

[8]    AT&T and Comcast filed their petitions for rehearing *en banc* on August 9, 2019.  On September 9, 2019, the panel issued orders calling for a response by the respective plaintiffs.

12

discovery * * * before the United States Supreme Court has ruled on the petitions for certiorari review in [a governing case]"); *Milkowski v. Thane Int'l. Inc.*, 2008 WL 11342962, at *2 (C.D. Cal. July 21, 2008) ("agree[ing] * * * that a stay pending petition for writ of certiorari will conserve judicial and party resources" because "[i]f the Supreme Court were to grant certiorari and resolve the issues in favor of [defendant], then further action by this Court may not be necessary").

Indeed, courts in this Circuit have stayed proceedings relating to the arbitrability of claims pending resolution of a petition for writ of certiorari seeking reversal of a then-governing Ninth Circuit precedent. *See Roman v. Northrop Grumman Corp.*, 2016 WL 10987312, at *3 (C.D. Cal. Dec. 14, 2016). In *Roman*, the court recognized that it was bound by the Ninth Circuit's then-governing ruling in *Morris v. Ernst & Young LLP*, 834 F.3d 975 (9th Cir. 2016) that bilateral arbitration agreements in employment contracts are unenforceable under the National Labor Relations Act ("NLRA").[9] However, the court also recognized that a reversal of *Morris* "would require bilateral arbitration in [*Roman*]" and concluded that a stay "would [therefore] serve 'the orderly course of justice'" by avoiding potentially unnecessary proceedings. *Roman*, 2016 WL 10987312, at *3; *see also McElrath v. Uber Techs., Inc.*, 2017 WL 1175591, at *1 (N.D. Cal. Mar. 30, 2017) (granting a stay during the pendency of Supreme Court proceedings in *Morris*); *Kim v. CashCall, Inc.*, 2017 WL 8186683, at *8 (C.D. Cal. June 8, 2017) (same).

This case is on all fours with *Roman*. As in *Roman*, a reversal of the Ninth Circuit's decision in *Blair* would "require bilateral arbitration" of all of Plaintiffs' claims. That is, if the FAA preempts the *McGill* rule, then AT&T's arbitration agreement and the parties' waiver of their respective rights to bring any collective action are enforceable.

The relative balance of equities likewise favors a stay. As the Ninth Circuit recognized more than 30 years ago, AT&T would be "serious[ly]" if not "irreparabl[y]" injured if this case were to proceed to discovery, motion practice, and potentially to trial—only for the Court to later conclude that it lacked jurisdiction all along to decide this case (which would be the result if the

---

[9]     The Supreme Court granted certiorari, consolidated *Morris v. Ernst & Young LLP* with *Epic*, and reversed *Morris* in light of its ruling in *Epic*. *See Epic*, 138 S. Ct. at 1632.

13

1    Ninth Circuit panel's decisions in *Blair*, *McArdle*, and *Tillage* are overturned).  *Alascom, Inc. v.*

2    *ITT N. Elec. Co.*, 727 F.2d 1419 (9th Cir. 1984).  That is because "the advantages of arbitration—

3    speed and economy—are lost forever" when a party who is entitled to arbitration is forced instead

4    to proceed in court.  *Id.* at 1422.

5         There is a high probability of such harm if the requested stay is not granted.  If the Ninth

6    Circuit does not correct the problem itself *en banc*, Supreme Court review of the rule of *Blair*,

7    *McArdle*, and *Tillage* would be likely:  The Supreme Court has repeatedly held that the FAA

8    preempts state-law attempts to limit arbitration agreements—thus signaling that the Court views

9    the scope of FAA preemption as an "important question of federal law" warranting a grant of

10   certiorari (*see* Sup. Ct. R. 10).  *See, e.g.*, *Concepcion*, 563 U.S. at 352 (reversing Ninth Circuit

11   decision requiring availability of class arbitration); *DIRECTV, Inc. v. Imburgia*, 136 S. Ct. 463,

12   471 (2015) (reversing state-law rule seeking to invalidate class waivers as preempted by the FAA);

13   *Kindred Nursing Ctrs.*, 137 S. Ct. at 1429 (invalidating state-law rule requiring more specific

14   consent for arbitration agreements than for other contract terms); *Epic*, 138 S. Ct. at 1621–23

15   (rejecting attempt to invalidate collective-action waivers under Section 2 of the FAA and reasoning

16   that the NLRA's protection of "concerted activities" does *not* create a right to collective litigation);

17   *Lamps Plus, Inc. v. Varela*, 139 S. Ct. 1407, 1417–19 (2019) (holding that FAA preempts state

18   *contra proferentem* doctrine that would have allowed plaintiffs to insist upon class arbitration).

19        Furthermore, the Ninth Circuit's analysis in *Blair*, *McArdle*, and *Tillage* sharply "conflicts"

20   with the Supreme Court's recent emphasis in *Epic* that the FAA "seems to protect pretty

21   absolutely" parties' agreements "to use individualized rather than class *or collective* action

22   procedures."  138 S. Ct. at 1621 (emphasis added).  Indeed, the Court has emphasized that "an

23   argument that a contract is unenforceable *just because it requires bilateral arbitration …*

24   impermissibly disfavors arbitration."  *Id.* at 1623; *see also, e.g.*, *Lamps Plus*, 139 S. Ct. at 1417-

25   19; *Concepcion*, 563 U.S. at 344.  Such hostility to the bilateral nature of arbitration and an

26   insistence on the availability of remedies on behalf of a "collective[]"—here, the "general

27   public"— is exactly what underlies California's *McGill* rule.  *See McGill*, 393 P.3d at 93–98.

28

Additionally, the panel's rulings are precisely the sort that meets the "exceptional importance" standard for *en banc* review in the Ninth Circuit.  Fed. R. App. P. 35(b)(1)(B).  Both AT&T and Comcast (the defendant in a companion case, *Tillage*) have petitioned for rehearing and rehearing *en banc* of the Ninth Circuit panel's rulings.  And the case for *en banc* review is strong:  *Blair* and the panel's related rulings decided issues of extraordinary importance for every company doing business in California.

On the other side of the scale, "[t]he only potential damage that may result from a stay is that the parties will have to wait longer for resolution of this case"—a risk courts have consistently characterized as negligible in the context of stays pending petitions for further appellate review. *E.g.*, *Nationstar Mortgage*, 2017 WL 1752933, at *2 ("The Court finds minimal any possible damage that this stay may cause" "pending the Supreme Court's disposition of the petitions for certiorari."); *Provo v. Rady Children's Hosp.-San Diego*, 2015 WL 6144029, at *2 (S.D. Cal. July 29, 2015) ("[T]he Supreme Court is likely to issue a decision within one year and neither party will be significantly prejudiced by a less than one year delay."); *Cherny v. AT&T, Inc.*, 2010 WL 2572929, at *2 (C.D. Cal. Feb. 8, 2010) (delay associated with awaiting resolution of a petition for further appellate review "will not prejudice anyone").  Indeed, granting the stay might not "ultimately lengthen the life of this case" at all, given that an equal delay could result if the court were to proceed notwithstanding the pendency of Supreme Court review and then "rebriefing or supplemental briefing [were] necessitated." *Nationstar*, 2017 WL 1752933, at *2.

In sum, if the Court concludes that the *McGill* rule would apply, AT&T requests that the Court delay its consideration of this motion until the conclusion of proceedings in *McArdle* and *Tillage* and dispose of the motion as appropriate in light of the final decisions in those cases.

## CONCLUSION

The Court should compel Scott, Jewel, and Pontis to arbitrate their claims in accordance with their agreements and stay this action pending the outcome.

September 11, 2019                                    MAYER BROWN LLP

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

By:  /s/ Archis A. Parasharami
Evan M. Tager
Archis A. Parasharami
Kevin S. Ranlett

*Attorneys for Defendants AT&T Services,
Inc., AT&T Mobility LLC, and AT&T Inc.*

16